## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## WEST PALM BEACH DIVISION

JOHN DOE, on behalf of
himself and all others similarly situated,

     Plaintiff,

v.

TOWN OF JUPITER; DET. ANDREW SHARP
#412/1101; DAVID ARONBERG, PALM
BEACH COUNTY STATE ATTORNEY,

     Defendants.

Case No. 19-cv-80513

**CLASS ACTION**
**JURY TRIAL DEMANDED**

## FOURTH[1] AMENDED CLASS ACTION COMPLAINT

Plaintiff John Doe, on behalf of himself and all others similarly situated, files this Amended Class Action Complaint against the Town of Jupiter (the "Jupiter Police"), Detective Andrew Sharp #412/1101 of the Jupiter Police ("Sharp"), and David Aronberg, State Attorney for the 15th Judicial District Florida ("Aronberg") (collectively, "Defendants") and alleges as follows:

### INTRODUCTION

1.    The United States Constitution protects individuals' rights to privacy and freedom from unreasonable searches. Accordingly, the government is allowed to intrude into private property and video record conduct only when it can show probable cause that: (a) specific grave crimes are being committed; (b) additional evidence of those crimes is needed; (c) no other means

---

[1] All prior amendments were made before the appearance of any defendants in this action. The first amendment brought Mr. Doe's claim on behalf of a putative class, the second amendment updated information regarding the anticipated size of the putative class, and the third amendment corrected the caption so the Town of Jupiter could accept service.

of obtaining that evidence is available; and (d) any intrusion will be narrowly tailored to avoid excessive invasion of privacy.

2.      Defendants violated Mr. Doe's constitutional rights on or around January 19, 2019, by spying on him while he was in a state of undress in a private massage room at a private spa facility, despite having failed to meet the constitutional requirements to secretly record him in that private setting.

3.      This action is brought as a class action of persons who patronized the Orchids of Asia Day Spa (the "Spa") from January 18, 2019 to January 22, 2019, were videotaped without their knowledge or consent while receiving a lawful massage, and have not been charged with any crime for their patronage of the Spa during the referenced time period.

4.      There is no question that Mr. Doe's and the putative class members' constitutional rights were violated because a prosecutor in State Attorney Aronberg's office already admitted so in open court. Indeed, he went so far as to admit that persons like Mr. Doe and the members of the putative class could claim Fourth Amendment violations.

5.      Despite this admission—and as is reflective of the policies and procedures implemented, executed, and countenanced by Defendants—the state prosecutor, Michael Kridos, referred to Mr. Doe and the putative class members as "**collateral damage**." TRANSCRIPT OF MAY 20, 2019 HEARING at 35, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District). He continued: "They picked the wrong day, and the wrong time, and the place to go in there." *Id*.

6.      Constitutional rights are not mere "collateral damage," though that is how they were treated by Defendants. Rather, the constitutional rights at issue are cornerstones of democracy, shielding from governmental incursion the dignitary and privacy interests held by each person.

This action seeks to hold Defendants accountable for intentionally and recklessly trampling those interests and prevent further damages to Mr. Doe and the members of the putative class.

<u>**NATURE OF THE ACTION**</u>

7.      This is an action at law and in equity pursuant to 42 U.S.C. § 1983 for deprivation under color of state law of rights, privilege, and immunities secured by the Constitution.

<u>**THE PARTIES**</u>

8.      Plaintiff John Doe is an individual residing in Jupiter, Florida.

9.      The Town of Jupiter is located in Palm Beach County, Florida. Its police department is a law enforcement agency located within the town of Jupiter in Palm Beach County, Florida.

10.      Andrew Sharp is employed as a detective by the Jupiter Police, is over the age of 18, on information and belief is a resident of Palm Beach County, Florida, and is being sued in his individual capacity for knowingly violating Mr. Doe's and the class members' constitutional rights.  Sharp is the affiant on several publicly-available affidavits sworn in connection with the investigation described below, from which this action arises. Upon information and belief, Sharp was the lead detective in that investigation.

11.      David Aronberg is the State Attorney for Palm Beach County, Florida, is over the age of 18, on information and belief is a resident of Palm Beach County, Florida, and is being sued in his individual capacity for knowingly violating Mr. Doe's and the class members' constitutional rights. The Florida State Attorney's Office, 15th Judicial District, is a Florida government agency tasked with the prosecution of criminal offenses in Palm Beach County, Florida, which includes Jupiter, Florida.

## CLASS ACTION ALLEGATIONS

12.     John Doe[2] is an adequate class representative because he, like all members of the proposed class, suffered the same injury (invasion of privacy under §1983) caused by the same unlawful conduct (unconstitutional/unlawful video recording), which was committed by the same defendants, at the same location (the Spa), on approximately the same dates (from January 18, 2019 to January 22, 2019). Moreover, like all members of the proposed class, John Doe was recorded without his permission and while receiving *lawful* massage therapy. Neither John Doe nor the other members of the class have been charged with any crimes relating to or arising from the conduct that was being investigated by Defendants.

13.     The class is defined as patrons of the Spa from January 18, 2019 to January 22, 2019, who were video-recorded without their knowledge or consent while receiving a lawful massage and have not been charged with any crime for their patronage of the Spa during the referenced time period.

14.     Damages would be readily ascertainable as to the effect of the unlawful activity on the members of the class.

15.     Questions of law common to the class, include, without limitation, whether:

    a.     Defendants deprived the collective rights, privileges, or immunities secured by the Constitution and laws while acting under color of law;

    b.     Defendants obtained the "sneak and peak" warrant for the video surveillance recklessly or under false pretenses;

    c.     the warrant was constitutional;

---

[2] "John Doe" or "Mr. Doe" will refer to the individual. "John Does" and "Jane Does" will refer to the members of the putative class.

    d. Defendants minimized the intrusion upon the class members' constitutionally protected right to privacy;

    e. the class members had a reasonable expectation of privacy in the locations recorded; and

    f. it was lawful, necessary, or permitted by the warrant to indiscriminately video record patrons of the Spa, including while disrobed and receiving lawful massage therapy.

16. Upon information and belief, the size of the class is at least 31 members, including John Doe. Discovery is needed to ascertain the full size of the class.

17. John Doe seeks class certification pursuant to Federal Rule of Civil Procedure 23(b)(1) because prosecuting separate actions would create a risk of inconsistent or varying adjudications with respect to individual class members that would establish incompatible standards of conduct for Defendants. Moreover, prosecuting separate actions would create a risk of adjudications with respect to individual class members that, as a practical matter, would be dispositive of the interests of the other members not parties to the individual adjudications or would substantially impair or impede their ability to protect their interests.

18. John Doe seeks class certification pursuant to Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

19. John Doe seeks class certification pursuant to Federal Rule of Civil Procedure 23(b)(3) because the questions of law and fact common to class members predominate over any questions affecting only individual members, and a class action is superior to other available

methods for fairly and efficiently adjudicating this controversy. If Defendants are found liable as to one class member, including John Doe, they will be liable as to all class members. Moreover, a class action is required because, adjudicating this matter in separate actions could lead to conflicting determinations of fact and law.

20.     The claims of John Doe are typical, if not identical, to those of absent class members.

21.     Class counsel consists of highly-regarded law firms and attorneys with extensive experience prosecuting class actions and §1983 claims. Class counsel and John Doe will fairly and adequately protect the interests of the absent class members.

**JURISDICTION AND VENUE**

22.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331, 1343(3) and (4).

23.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and (c). The wrongful acts alleged herein occurred in this District.

**FACTUAL BACKGROUND**

**I.     The Jupiter Police Investigate Suspected Prostitution**

24.     In October 2018, the Jupiter Police began a prostitution investigation of massage parlors in Palm Beach County.

25.     The focus of that investigation was the Spa.

26.     Through internet research, Sharp became suspicious that the Spa was involved in prostitution.

27.     Sharp visited an internet forum called www.rubmaps.com, where individuals freely discuss their sexual experiences at illicit massage parlors.

28.     According to Sharp, there were several posts about the Spa on www.rubmaps.com, leading him to believe that the Spa was involved in prostitution.

29.     Sharp also claims to have surveilled the Spa for an extended period in November 2018, during which time he claims to have only seen men enter the Spa.

30.     Without probable cause and without a warrant, Sharp requested that an inspector from the Florida Department of Health perform a warrantless search of the Spa. That investigator, Karen Herzog, interviewed each of the employees present in the Spa and took pictures of their identification and a fridge and a freezer.  Herzog also completed a report indicating that the Spa was not used as a place of domicile.

31.     After that, Sharp continued to surveil the outside of the Spa. Specifically, he would watch men enter the Spa and then, upon departure, the Jupiter Police would follow them until they purportedly committed a traffic violation, at which time they were pulled over and interviewed. A number of these men purportedly described receiving low-level sexual services—in particular, manual genital stimulation—in addition to massage, in exchange for money.

32.     When shown photographs of the individuals previously identified as the Spa's employees, a number of these men admitted that particular Spa employees had performed massage as well as sexual services on them and/or had accepted payment in exchange for the same.

33.     All of these men described receiving towels or napkins from Spa employees with which to clean up their seminal fluid after ejaculating.

34.     Jupiter Police personnel rifled through the Spa's trash multiple times and obtained samples from napkins which tested positive for seminal fluid.

35.     Jupiter Police personnel obtained a "wage and hour" report from the State of Florida for the Spa's managers, which showed those managers' reports of their own income. Sharp would

later state that this report was "evidence that the majority of the income generated by the [Spa] was a result of prostitution crimes . . . and [the managers] were deriving support from the money generated from the prostitution crimes being committed by and through the [Spa]." PROBABLE CAUSE AFFIDAVIT at 15, Jupiter Police Department Case No. 18-005410 (February 15, 2019).

36.    Sharp also "determined that the Comcast cable bill and the Florida Power and Light bill for the [Spa] were being paid by this business," which he claimed provided further evidence that the Spa's president was "deriving support … through the crimes of prostitution she is engaging in and perpetuating [*sic*] through her employees." *Id.*

37.    The Jupiter Police also identified and sought to search bank accounts and deposit boxes belonging to the Spa and its management.

38.    In short, within weeks of commencing its investigation, the Jupiter Police and Sharp had obtained overwhelming evidence that certain masseuses were engaging in low-level prostitution at the Spa, and that the Spa's managers were both participating in those sex acts and deriving support from others' low-level prostitution, and therefore had no basis or need to record Mr. Doe or the Jane and John Does while undressed and receiving massages in private massage rooms.

## II.    The Jupiter Police Install Spy Cameras In The Massage Rooms At The Spa

39.    Defendants sought to place video recording devices in the Spa to record every single customer of the Spa indiscriminately.

40.    On the basis of false information sworn to by Sharp—and with the knowledge, assistance, instruction, and encouragement of the Jupiter Police and Aronberg—Defendants caused the Honorable Judge Howard Coates of the Fifteenth Judicial Circuit to issue a highly-invasive "sneak-and-peak" warrant (the "Warrant") for the Spa, authorizing five days of invasive, covert surveillance and recording.

41.     On January 18, 2019, the Jupiter Police caused a false "suspicious package" warning to be issued for the Spa.  Having evacuated the Spa, the Jupiter Police then entered and installed video-recording devices in rooms in which members of the public received massages, as well as in the lobby, pursuant to the Warrant.

42.     The Spa and its employees and managers were given no formal notice of the issuance of the Warrant or the placement of video-recording equipment on the premises.

43.     The Jupiter Police were able to monitor and record the activity in the Spa's massage rooms in real time and did so for a period of approximately five days, starting on January 18, 2019.

## III.    Defendants Wrongfully Record At Least 31 People Disrobed Before and While Lawfully Receiving Massages

44.     On or around January 19, 2019, Mr. Doe entered the Spa and received a lawful massage, while undressed, in a private massage room.

45.     Mr. Doe had a reasonable expectation of privacy when he entered that private room, on private property, to receive treatment from a licensed healthcare practitioner—namely, a massage therapist. Defendants had fair warning and notice that Mr. Doe had a reasonable expectation of privacy in the private rooms.

46.     From January 18, 2019 to January 22, 2019, the Jane Does and John Does of the class also patronized the Spa and received lawful massages while undressed in private massage rooms.

47.     Each of the Jane and John Does of the class had a reasonable expectation of privacy, of which Defendants had fair warning and notice.

48.     The Jupiter Police recorded Mr. Doe, the Jane Does, and the John Does while undressed and receiving massages. Neither Mr. Doe, nor the Jane or John Does, engaged in any illicit activity while receiving their massages at the Spa.

49.     Indeed, Sharp admitted that they recorded "**completely innocent people naked in the massage rooms**" at the Spa. TRANSCRIPT OF APRIL 26, 2019 HEARING VOLUME I at 134, *State of Florida v. Robert Kraft*, Palm Beach County Case No. 2019-MM-002346 (Fla. 15th Judicial District).

50.     Upon information and belief, the Jupiter Police shared these recordings with other individuals and organizations pursuing or acting in parallel with the investigation, including officers employed by the Jupiter Police, Aronberg, and, on information and belief, the Martin County Sheriff and the Martin County District Attorney, who were running a related investigation.

**IV.     The Jupiter Police Charge Individuals With Misdemeanor Solicitation of Prostitution**

51.     On February 19, 2019, about a month after its illegal surveillance operation finished, law enforcement raided the Spa, executed several other search warrants, and arrested the Spa's two managers.

52.     A few days later, the Jupiter Police filed misdemeanor charges against a number of alleged Spa customers, charging them with solicitation of prostitution.

53.     Neither Mr. Doe, nor the Jane and John Does have been charged with any crime.

**V.     Public Access to View Surveillance Video**

54.     Pursuant to Florida's public records laws, "all state, county, and municipal records are open for personal inspection and copying by any person." Fla. Stat. § 119.01(1).

55.     The State has received hundreds of requests for the surveillance videos recorded by Defendants. While the media intervening in the underlying criminal actions have attested they are not seeking recordings of lawful activity, the class members justifiably are concerned that the videos of them will be released to the media or other members of the public pursuant to the hundreds of public-record requests received by the State.

56.     Defendants indiscriminately video recorded Mr. Doe and the Jane and John Does knowing that they were doing so unlawfully and knowing the high risk (which remains) that the recordings could be publicized, including through Florida's public records laws.

57.     Defendants knew that the risk of public-access demands would be particularly acute in the present case, as at least one defendant charged with misdemeanor solicitation of prostitution included a high-profile individual.

## VI.     Defendants Obtained the Warrant Under False Pretenses

58.     To obtain the required court order for the highly-invasive "sneak and peek" warrant Defendants desired, Sharp (the affiant) and the Jupiter Police, submitted a sworn affidavit (the "Affidavit") to the Honorable Judge Howard Coates of the Fifteenth Judicial Circuit.

59.     Critically, Sharp and the Jupiter Police (as advised, directed, encouraged, and enabled by Aronberg directly and through attorneys in his office) submitted the Affidavit without the least regard for whether its contents were true. In fact, as Sharp, the Jupiter Police, and Aronberg knew, the Affidavit was riddled with false statements and omissions designed to justify the highly invasive, unnecessary, and unlawful warrant, and avoid restrictions that would have safeguarded Mr. Doe's and the Jane and John Does' privacy interests.

60.     Judge Coates relied on one or more of these deliberate, material misrepresentations and omissions, which intentionally and recklessly were encouraged, countenanced, and ratified by the Jupiter Police, including Sharp's supervisors, and Aronberg, either directly or indirectly through persons in his office. In doing so, the Jupiter Police and Aronberg were deliberately and recklessly indifferent and, in fact, hostile to Mr. Doe's and the Jane and John Does' rights. Absent these false statements and omissions, Judge Coates would not have issued the invasive "sneak and peak" warrant (the "Warrant"). Further, even if Judge Coates would have issued the invasive "sneak and peek" warrant, were it not for one or more of the false statements and omissions, the

11

Warrant would have included restrictions to protect Mr. Doe's and the Jane and John Does' constitutional rights.

61.     For example, to convince Judge Coates of the need for the highly-invasive "sneak and peak" warrant, the Affidavit included baseless allegations that the Spa was involved in the much more serious crime of human trafficking. Further, Defendants knowingly omitted from the Affidavit material information indicating that the Spa was not being used as a domicile for purposes of human trafficking. Subsequently, a prosecutor in Aronberg's office admitted that there is no evidence of human trafficking.

62.     In addition to the baseless allegations of human trafficking, Sharp and the Jupiter Police took it a step further by altering a sample affidavit provided to Sharp by Aronberg's office to make it appear there was human trafficking of "girls" at the Spa, when Defendants knew that the women working at the Spa were adult, middle-aged women and had no reason to believe that any under-aged girls were working there. Defendants knew that these misrepresentations would be (and, in fact, were) material to Judge Coates' issuance of the Warrant.

63.     To give Judge Coates false confidence that the "sneak and peek" warrant was appropriate under the circumstances, Sharp and the Jupiter Police, with assistance and encouragement from Aronberg, directly or indirectly through attorneys in his office, represented that Sharp had "experience in investigating similar illicit spa/massage parlor businesses," AFFIDAVIT at 8, had "specialized training and experience in the investigation of prostitution organizations," *id.*, and referred to his "experience in investigating Asian/Latin Massage parlors." *Id.* at 9. Defendants knew those were gross misrepresentations.

64.     Sharp was one of the **least** experienced detectives with the Jupiter Police, having only made detective about two years before the Spa investigation started.

65.     Sharp had no "specialized . . . experience investigating prostitution organizations." Indeed, he had never investigated a prostitution organization or the crime in question.

66.     Moreover, Sharp had never gotten a "sneak-and-peak" warrant before, let alone one for a prostitution-organizations case.

67.     And Sharp's supposed "**specialized** training" in prostitution organizations consisted of a few classes relating to other subjects that happened to touch briefly and incidentally on prostitution organizations.

68.     Defendants misrepresented Sharp's training and experience knowing that his purported training and experience would be (and, in fact, was) material to Judge Coates' issuance of the Warrant and the absence of restrictions that would have protected the Jane and John Does' constitutional rights.

69.     Further, to give Judge Coates false confidence that the highly-invasive Warrant should be granted, Sharp and the Jupiter Police represented that Sharp had "strongly considered the 1990 10th Circuit Court of Appeals decision U.S. v. Mesa Rincon, 911 F.2d 1433 (10th Cir. 1990)" and a series of other cases, pursuant to which "all legal guidelines have been met through this investigation." AFFIDAVIT at 9.

70.     It turns out, however, that Sharp had never even read the cases he claimed to have "strongly considered." Rather, at most, he discussed them with Aronberg or prosecutors in Aronberg's office who told him to leave the cases in the Affidavit despite knowing that Sharp did not understand what they signified and that Sharp's falsely-reported consideration of them would be (and was) material to Judge Coates' issuance of the Warrant and the absence of restrictions that would have protected the Jane and John Does' constitutional rights.

71.     Though Sharp and the Jupiter Police, at the instruction of Aronberg's office, included the cases in the Affidavit to assure Judge Coates that "all legal guidelines have been met through this investigation," and though Sharp claimed to have "strongly considered" those cases, AFFIDAVIT at 9, Defendants knew that Sharp had no idea what the cases actually said or the legal propositions they stood for. He did not even know the legal basis for his purported authority to obtain the sneak-and-peak Warrant.

72.     In the Affidavit, Sharp and the Jupiter Police also claimed that they sought the Warrant for the purpose of "covertly conducting electronic video **surveillance**," assuring Judge Coates that the "covert **surveillance** cameras will only be placed in locations where prostitution is believed to be occurring" and not in "areas expected to be non-criminal in nature," and that the "surveillance will be **monitored**." AFFIDAVIT at 10-11. They did not say what Defendants actually were planning (and actually did do), which was continuously and indiscriminately record every single person who walked into the private massage rooms, places where Defendants knew members of the public would disrobe before receiving lawful massages.

73.     Indeed, Sharp and the Jupiter Police went so far as to intentionally avoid use of the term "recording" when referring to what they planned to do. For example, in the Affidavit, Sharp and the Jupiter Police represented that the equipment they planned to use would not "allow monitoring or **recording**" of audio. AFFIDAVIT at 10 (emphasis added). But in surrounding sentences, they used only the term "**monitoring**" (indicating real-time surveillance, as opposed to indiscriminate recording they knew would be made available to the public) and omitted the term "**recording**" when referring to what they planned to do with surveillance equipment, which was monitor **and record** everything and everyone continuously and indiscriminately in four private massage rooms for 5 days straight. The Warrant reflects these intentional misrepresentations and

omissions, particularly in the paragraphs describing the conduct authorized, which expressly refer to "surveillance" and "monitoring," but not "recording."

74.     Critically, in the Affidavit, Sharp and the Jupiter Police also swore that they would "search" only persons in the Spa "who are reasonably believed to be involved in the crimes or crimes." AFFIDAVIT at 1. This too was an intentional and material misrepresentation designed to convince Judge Coates that the Warrant sought was limited in scope when, in fact, Defendants knew that what they actually planned to do was far beyond the scope of anything permitted by well-settled law, of which they had ample knowledge and notice.

75.     Defendants knew they were going to monitor and record **everyone** in the private rooms continuously for five days, regardless of whether Defendants "reasonably believed" those persons would be involved in a crime.

76.     Defendants monitored and recorded Mr. Doe and Jane and John Does who they did not reasonably believe would commit a crime, and even monitored and recorded them disrobed, despite affirmatively believing that they **would not** commit a crime. Moreover, Defendants continued monitoring and recording Mr. Doe and Jane and John Does disrobed even after it was clear that they had not obtained and would not obtain illicit services.

77.     Judge Coates would not have issued the Warrant but for one or more of the foregoing deliberate and reckless misrepresentations and omissions, which were made by and at the direction and encouragement of each Defendant. The Jupiter Police and Aronberg further countenanced and ratified these misrepresentations and omissions knowing their falsity and knowing they would be (and were) material to Judge Coates' issuance of the Warrant and the absence of restrictions that would have protected Mr. Doe's and the Jane and John Does' constitutional rights.

## VII.    Unlawful Execution of the Unlawfully Obtained Warrant

78.    Defendants obtained the "sneak-and-peak" warrant knowing it is well-settled under the law that such warrants impose a solemn duty on the government to execute them in a manner that minimizes their invasiveness, particularly with respect to noncriminal activity. Indeed, a prosecutor in Aronberg's office subsequently admitted: "[T]here's certain **basics**, obviously, which is **first and foremost** you **have to make sure** that whatever you record is, **obviously**, part of that crime in one way, shape or form. And if it's not, **you're not supposed to be recording it** or move off." TRANSCRIPT OF MAY 20, 2019 HEARING at 39, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District).

79.    Moreover, two judges have found that Defendants, in their execution of the Warrant, took no steps to minimize its invasiveness, and a prosecutor from Aronberg's office admitted that "we did not minimize **at all**" with respect to at least some of the Jane and John Does. TRANSCRIPT OF MAY 20, 2019 HEARING at 42, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District).

80.    The false statements and omissions in the Affidavit, as well as the failure to minimize, were caused by Defendants intentional misdeeds, reckless acts, and deliberate indifference to Mr. Doe's and the Jane and John Does' rights, as encouraged, directed, and ratified by the policies, practices, and customs of the Jupiter Police and Aronberg.

81.    Notably, even officers conducting or supervising the highly-invasive monitoring and recording did not know the basics of minimization, further evidencing the systemic failures caused by the Jupiter Police's and Aronberg's policies, practices, customs, and reckless indifference to constitutional rights.

82.    Instead of minimizing surveillance by monitoring only Spa customers believed to be engaged in illicit conduct, Defendants used the unlawfully-obtained Warrant to monitor and

record everyone, including persons that Defendants (by their own admissions) had no reason to expect would engage in unlawful conduct.

83.     For example, Sharp and the Jupiter Police admitted that they did not expect women would be at the Spa for an unlawful purpose, yet the cameras continued recording and officers (including or in plain sight of male officers) continued monitoring those Jane Does in real time even while they were disrobing and receiving lawful massages in private rooms. Notably, they did so even though Defendants indicated in the Affidavit that only male patrons would be surveilled.

84.     Moreover, instead of recording only illicit conduct, or at least waiting until there was an indication that illicit conduct was imminent, Sharp and the Jupiter Police—with assistance and encouragement from Aronberg (directly or indirectly through attorneys in his office) recorded everyone in four private rooms for 5 days straight.

85.     This was done intentionally and in gross violation of well-settled law and these victims' privacy rights.

86.      Plainly the illicit conduct Defendants claimed to be looking for would not be so brief as to have prohibited officers from turning on the recording function after the illicit conduct began. Moreover, the illicit exchange of money was believed to occur in the lobby, not the private massage rooms.

87.     Two judges have held that there was an expectation of privacy in the private massage rooms and suppressed the evidence obtained from the Warrant. AMENDED ORDER ON MOTION TO SUPPRESS  ¶ 5, *State of Florida v. Robert Kraft*, Palm Beach County Case No. 2019-MM-002346 (Fla. 15th Judicial District, May 14, 2019) ("[T]he Court finds it **clear** that [an invitee to the Spa] had a reasonable, subjective expectation of privacy, as would **anyone** seeking a private massage in a commercial or professional setting, and that the activity in that room would **remain**

private. Seeking legitimate services in a spa **normally** involves removing all or most of a person's clothing, behavior almost as private as would occur **in a home**.") (emphasis added); ORDER ON MOTION TO SUPPRESS at 11, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District (the private rooms at the Spa were places "with a legitimately high expectation of privacy").

88.    Defendants knew that the Warrant was obtained unlawfully, and knew the Warrant would be (and was) executed unlawfully.

**VIII.   Defendants All Played Critical Roles in the Violation of the Plaintiffs' Privacy Rights**

89.    Aronberg's office has admitted that the Plaintiffs' privacy rights were violated and that they too were responsible. Among other things, a prosecutor in Aronberg's office admitted: "[C]ould **we** have done it differently, yeah, **we** should have done it differently. **We** should have shut it off . . . . I'm not trying to rationalize it." TRANSCRIPT OF MAY 20, 2019 HEARING at 42, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District).

90.    Later, the prosecutor from Aronberg's office stated: "Judge, I'll be the first to tell you, **we** should've done it differently. **We** didn't do it differently. **We** didn't account for that. And to those people, **we** obviously apologize to. That should not have happened. But the fact remains is—and I'm not minimizing what **we** did, **we're** taking **full** responsibility for it.'" *Id.* at 51. He stated also: "The bottom line is they obviously were recorded when they **should not have been recorded**." He said: Minimizing "was left for the officer to do that and **we** did not do that." *Id.* at 52.

91.    During the course of the investigation, and in conjunction with Defendants' misrepresentations to Judge Coates and their unlawful execution of the unlawful Warrant, Sharp worked closely and in concert with Aronberg, either directly or through the members of his office,

and supervisors at the Jupiter Police, all of whom knew of, encouraged, enabled, and ratified his misconduct.

92.     Similarly, Aronberg and the Jupiter Police, including senior-level decision makers with the Jupiter Police, knew that Sharp did not have the experience and training claimed in the Affidavit, and that Sharp did not understand the meaning of the cases he cited in the Affidavit. Nonetheless, they advised, encouraged, and enabled Sharp to keep those false statements in the Affidavit, as well as the cases cited.

93.     Defendants knew that the surveillance equipment would be used for unceasing, indiscriminate recording, an act they did not believe and could not reasonably have believed was permitted by any legal standard regulating video recording of members of the public, let alone innocent people they knew would be disrobed in a private location while receiving private, lawful massages. Despite this, Aronberg and the Jupiter Police advised, instructed, encouraged, and enabled Sharp and other members of the Jupiter Police to unceasingly and indiscriminately record everyone in the Spa's private rooms for approximately 5 days, including people in the nude who they did not believe would (and did not actually) engage in illicit conduct.

94.     Defendants did all of this knowing that, under Florida's public records laws, members of the public and press would be able to obtain copies of the videos depicting innocent and uncharged members of the public disrobed. Defendants knew with certainty that the videos would be watched and knew of the high likelihood that the videos would be made available, requested, and disseminated to the public, a risk that remains high.

95.     Further, even after monitoring and recording the first innocent Jane or John Doe, Defendants subsequently continued to monitor and record one innocent Jane and John Doe after another, without regard for their rights.

96.     Moreover, on information and belief, Defendants continued to record Jane and John Does even after knowing that a high-profile celebrity would be charged, which, they knew would (and actually did) generate national and international press and wide public interest such that the video recordings would be requested under Florida's public records laws and likely broadcast and disseminated online, causing further irreparable damage to the Jane and John Does.

97.     Defendants knew that Mr. Doe and the Jane and John Does would suffer damages as a direct result of Defendants' misconduct.

98.     Among other things, Defendants knew that Mr. Doe and the Jane and John Does would suffer damages from having been monitored and recorded disrobed without their knowledge or consent. That, unbeknownst to them, their image was broadcast live on an iPad or to a group of people on a widescreen TV. And that further, strangers could and actually did watch those videos of them without their knowledge and consent.

99.     Further still, Defendants knew that Mr. Doe and the Jane and John Does would suffer damages because of the high risk that those videos could, at any moment, be made widely available to the public (intentionally or unintentionally).

100.    To make matters worse, and despite knowing that they had wrongly monitored and recorded the Jane and John Does (which they subsequently admitted), and despite knowing that the Jane and John Does irreparably would be associated with an illicit massage parlor and the falsely-alleged human trafficking of "girls," Defendants made no effort to protect Mr. Doe's or the Jane and John Does' privacy rights, which they had already violated.

101.    On the contrary, after promising in open court that they would not release the recordings absent a court order directing them to do so, and admitting the recordings of innocent victims like Mr. Doe would be of little or no value to any party to the criminal proceedings,

Defendants filed a notice of intent to release the surveillance footage to the media, claiming they were required to do so under public records laws. This lead to a hearing before Judge Hanser in *State v. Zhang* and *State v. Wang*, Case No. 50-2019-CF-001606 (Circuit Court for the 15th Judicial District in and for Palm Beach County, Florida), who ordered on April 17, 2019 that the surveillance footage could not be released absent a direct order from him permitting Defendants to do so.

102.    Despite that order, there is a high risk that the surveillance recordings depicting Mr. Doe and the Jane and John Does will be made available to the public, either through public-records requests or intentional or inadvertent disclosure by Defendants.

103.    Indeed, within 24 hours of Judge Hanser's order, the surveillance footage, which was exclusively in the possession and control of Defendants, suddenly was being shopped to various news outlets.

104.    Upon information and belief, the individual(s) shopping the video surveillance are involved in law enforcement. Thus, Defendants either have recklessly allowed one of their employees to steal and attempt to sell the video or, worse, are intentionally seeking to release the video to force a plea bargain from the defendants while trampling Mr. Doe's and the Jane and John Does' privacy rights.

## IX.    The Question of Whether Mr. Doe's Constitutional Rights Were Violated is Settled

105.    Mr. Doe's constitutional rights, as well as the Jane and John Does' constitutional rights, were violated. That is indisputable. Indeed, referring to at least some of the Jane and John Does, a prosecutor in Aronberg's office stated: "[T]hose individuals who were recorded and should not have been recorded are the only ones that **can claim a Fourth Amendment violation** . . . . And we would, again, tell the Court that those four were **unreasonably seized**." TRANSCRIPT OF

MAY 20, 2019 HEARING at 56, *State of Florida v. Lei Wang*, Palm Beach County Case No. 2019-CF-0001606 (Fla. 15th Judicial District).

## COUNT 1

### (Violation of 42 U.S.C. § 1983)

106.     Plaintiff repeats and re-alleges the allegations set forth above as though fully set forth herein.

107.     Mr. Doe and the class members had a reasonable expectation of privacy when they were at the Spa, including while in private rooms located on private property at the Spa.

108.     The Defendants' actions, including their monitoring and recording of Mr. Doe's and the class members' conduct while located in a private room located on private property, deprived Mr. Doe and the class members of their rights, privileges, and immunities secured and guaranteed by the United States Constitution.

109.     Specifically, and among other things, Defendants' actions:

   a.   violated Mr. Doe's and the class members' right to be free from unreasonable search and seizure in violation of the Fourth Amendment to the United States Constitution;

   b.   violated Mr. Doe's and the class members' Fourteenth Amendment Right to procedural due process;

   c.   violated Mr. Doe's and the class members' constitutional right to privacy; and

   d.   constituted a gross abuse of power that is shocking to the conscience.

110.     In doing so, the Defendants acted willfully, maliciously, and in violation of law, established practices, and their duties.

111.     As a result of Defendants' actions, Mr. Doe and the class members suffered and continue to suffer invasion of their privacy, embarrassment, emotional distress, loss of business opportunities, and substantial expenses—including legal fees and court costs—in vindicating their rights.

112.     Mr. Doe and the class members have needlessly and maliciously been robbed by Defendants of control over their privacy, person, and dignity. Among other things, they intentionally, needlessly, and recklessly have been denied their right to determine who sees them disrobed and even nude.

113.     Mr. Doe and the class members did nothing wrong, yet surveillance and videos of them disrobed and nude have been seized, viewed, recorded, and then re-watched without their knowledge or consent. Further, they have been and remain fearful that videos of them disrobed and nude will be released intentionally or unintentionally by Defendants to the public, where they will be broadcast online and republished *ad infinitum* causing further irrevocable and permanent damages to them. This reasonable and unjustly-imposed fear will persist until all copies of the videos are destroyed.

114.     This Count is brought within the time permitted by law.

115.     Mr. Doe has retained undersigned counsel to represent his and the class members in this action to vindicate their rights.

116.     All conditions and requirement to bringing this action have been satisfied.

## **PRAYER FOR RELIEF**

WHEREFORE, Mr. Doe requests the Court certify the proposed class and enter judgment:

(a)     awarding money damages;

(b)     awarding punitive and exemplary damages;

(c)     awarding reasonable costs and expenses incurred in this action, including, to the extent applicable, counsel fees;

(d)     enjoining the Defendants from ever publicizing or otherwise transmitting to any other person or organization, and ordering them to permanently and completely destroy, any and all video, audio, photographic, or other recordings, or any images or other records derived from or based on recordings, made inside the Spa;

(e)     ordering the Defendants to identify any person or organization to whom they previously transmitted or granted access to, or who may have accessed, any and all video, audio, photographic, or other recordings, or any images or other records derived from or based on recordings, made inside the Spa;

(f)     requiring the Defendants to submit affidavits to the Court, within fourteen (14) days of the entry of judgment, confirming and providing specific details of their compliance with the Court's order described above in (d), and providing the information described above in (e); and

(g)     granting such other relief as the Court deems just and proper.

[*signature block on next page*]

Dated: June 28, 2019

REED SMITH LLP

By:     */s/ Edward Mullins*
Edward M. Mullins
Fla. Bar No. 863920
Jordan W. Siev
(Admitted *Pro Hac Vice*)
Daniel Alvarez Sox
Fla. Bar No. 108573
emullins@reedsmith.com
jmccarroll@reedsmith.com
jsiev@reedsmith.com
dsox@reedsmith.com
1001 Brickell Bay Drive, 9th Floor
Miami, Florida 33131
Tel: (786) 747-0200
Fax: (305) 747-0299

-and-

Joseph Tacopina, Esq.
(Admitted *Pro Hac Vice*)
The Law Offices of Tacopina & Seigel
275 Madison Ave., Ste. 3500
New York, NY 10016
Tel: (212) 227-8877
Fax: (212) 619-1028
jtacopina@tacopinalaw.com

*Attorneys for John Doe*

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 28, 2019, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to counsel or parties of record.

By: <u>*/s/ Edward Mullins*</u>
Edward M. Mullins